UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -:

LUPE ELI,                 :      16 Civ. 6683 (JCF)

        Plaintiff,     :       MEMORANDUM

                      :       AND ORDER

   - against -         :

                      :

NANCY A. BERRYHILL, Acting    :
Commissioner of Social Security,   :

        Defendant.     :

- - - - - - - - - - - - - - - - - -:

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/21/17

The plaintiff, Lupe Eli, brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of the determination of the Acting Commissioner of Social Security (the "Acting Commissioner") that she is not entitled to Title XVI Supplemental Security Income ("SSI"). Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following reasons, the plaintiff's motion is granted and the Acting Commissioner's cross-motion is denied.[1]

Background

A.   Medical History

    1.   Medical History Prior to Application for Benefits

Ms. Eli has a long and complex medical history. She claims

---

[1] The parties have consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c).

she cannot work because of variety of ailments including vesicoureteral reflux, pyelonephrosis, Crohn's disease, diverticulitis, osteoporosis, a pilonidal cyst, rheumatoid arthritis, radiculopathy, severe migraine headaches, carpal tunnel syndrome, and endometriosis. (R. at 158).[2] She notes that she began experiencing severe abdominal pain when she was thirteen years old. (R. at 688). She has suffered from constipation, diarrhea, and rectal bleeding for most of her life. (R. at 688). She was diagnosed with irritable bowel syndrome when she was thirty-one, and Crohn's disease when she was thirty-three. (R. at 688). The first medical records included in the record for this case are from 2005, when Ms. Eli went to St. Francis Hospital complaining of severe abdominal pain and vomiting. (R. at 295). A CT scan was performed of her abdomen and pelvis, and the doctors identified right hydronephrosis.[3] (R. at 301). Ms. Eli returned to St. Francis Hospital many times over the next several years for treatment (R. at 259, 268-73, 284, 299-304), but doctors at St. Francis were unable to determine the exact cause of her ailments.

---

[2] "R." refers to the Administrative Record filed with the Acting Commissioner's Answer.

[3] Hydronephrosis is "[d]ilation of the pelvis and calices of one or both kidneys. This may result from obstruction to the flow of urine, vesicoureteral reflux, or it may be a primary congenital deformity without an apparent cause." Stedman's Medical Dictionary 841 (27th ed. 2000) ("Stedman's").

(R. at 277, 299-313). In 2008, Mrs. Eli had a total abdominal hysterectomy due to a postpartum hemorrhage. (R. at 396). That same year she underwent ureteral reconstruction and reimplantation surgery. (R. at 396).

On January 19, 2012, the plaintiff was treated at Vassar Brothers Medical Center for back pain. (R. at 318-24). After bending, she felt a series of three pops in her lower back, followed by pain. (R. at 318). The doctors noted that she had a history of scoliosis, but no other prior back issues. (R. at 327). She was able to walk, albeit with great pain. (R. at 319). An x-ray revealed a "mild lumbar curvature convex to the left," and a "[m]ild loss of disc height at L5-S1 posteriorly . . . likely related to mild degenerative disc disease." (R. at 327-28). She was prescribed methocarbamol for muscle spasms, Percocet for pain, Prednisone, and Zofran, and was told not to work, lift objects, bend, or twist. (R. at 329).

Ms. Eli returned to the St. Francis Hospital Emergency Room on March 3, 2012, complaining of constant, sharp right flank pain. (R. at 252). The next day she underwent a CT scan, which revealed "no acute findings in the abdomen or pelvis." (R. at 256). Two months later, on May 4, 2012, she was hospitalized for four days due to extreme right flank pain. (R. at 236). During that stay, the plaintiff was treated for right kidney infection, urinary tract

infection, and right hydronephrosis. (R. at 237). She said that she was able to walk and perform her activities of daily living independently. (R. at 238). On May 20, 2012, she was treated with valium, ibuprofen, and Percocet for numbness and pain in her right hand and fingers. (R. at 331-33). She returned to the emergency room on May 30, 2012, complaining of pain and weakness in and between her legs. (R. at 244). She was again treated with Percocet. (R. at 245). She again went to the emergency room on June 8, 2012, complaining of pain in her right flank and right arm. (R. at 248). She was given hydromorphone and discharged. (R. at 249).

The plaintiff was next treated for chronic pain on August 3, 2012, again complaining of significant right abdominal pain. (R. at 402). Dr. Cornelius Verhoest suspected that she had another urinary tract infection and prescribed Percocet, Prometrium, Premarin vaginal cream, and Ciprofloxacin. (R. at 402). Ms. Eli went to the hospital on August 7, 2012, again for right flank pain. (R. at 338). She underwent another CT scan, which was unremarkable and showed no signs of any particular acute disease. (R. at 349-51). The plaintiff went back to the emergency room in a wheelchair on September 17, 2012, after hearing pops in her back while bending over. (R. at 356). X-rays were mostly unremarkable, finding no evidence of "acute fracture or dislocation." (R. at 367). Ms. Eli

was again prescribed Percocet and Flexeril.  (R. at 368).

Around the same time, the plaintiff was referred to a urologist, Dr. Roger Riechers.  (R. at 403-04).  Dr. Riechers found that her kidneys were normal in size and shape, and that her chronic pain was likely due to reflux.  (R. at 406, 408-09).  He performed tests that confirmed this hypothesis.  (R. at 405).  Dr. Riechers reported that throughout early October 2012, Mrs. Eli was "significantly symptomatic."  (R. at 409).  During this period, he discussed various treatment options with Ms. Eli, and renewed her Percocet prescription.  (R. at 409).  On October 17, 2012, Dr. Riechers performed a cytoscopy to observe the plaintiff's ureter, and injected gel to prevent the back-flow of urine.  (R. at 413). After this procedure Dr. Riechers concluded that Ms. Eli had "massive vesicoureteral reflux."[4]  (R. at 414). Despite these efforts, Ms. Eli returned on October 23, 2012 with worsening symptoms.  (R. at 416).  Dr. Riechers found evidence of hydronephrosis in the plaintiff's right kidney  (R. at 416-17), and placed a stent to attempt to solve this problem (R. at 421).

On November 12, 2012, Dr. Riechers noted that the stent would need to be removed in order to determine whether Ms. Eli had actually improved or not.  (R. at 422).  This procedure was

_____

[4]  Vesicoureteral Reflux is "backward flow of urine from bladder into ureter."  Stedman's 1542.

performed on November 21, 2012.  (R. at 425).  At this appointment,
Dr. Reiechers found that Ms. Eli had another urinary tract
infection and was "miserable" with the pain.  (R. at 424).  She
returned two days after the stent removal with continued abdominal
pain.  (R. at 429).  She was taking her prescribed Percocet, but it
was not providing much relief.  (R. at 429).  On November 30, 2012,
she returned to Dr. Riechers, still in pain, albeit less than
before.  (R. at 431).  Dr. Riechers hypothesized that the plaintiff
had pain from chronic pyelonephritis[5], and planned to run tests to
determine if she was still experiencing reflux despite the
treatment.  (R. at 431).  He performed another operation on
December 10, 2012, which confirmed there was no current
vesicoureteral reflux.  (R. at 432).

A month later, on January 7, 2013, Ms. Eli was treated again
for flank pain.  (R. at 435).  She described dark spots on her back
and "leopard spots" on her right side, and the examining doctor
also noted "a couple of small café au lait appearing macules on her
back."  (R. at 435).  On January 22, 2013, she was examined by Dr.
Abraham Fruchter, who noted that Ms. Eli's pain had grown worse
over the preceding week.  (R. at 380-81).  She also had severe back

---

[5]  Pyelonephritis is a kidney infection "that generally begins
in your urethra or bladder and travels to one or both of your
kidneys."    Kidney   Infection,   _available   at_   http://
www.mayoclinic.org/diseases-conditions/kidney-infection/
home/ovc-20342583 (last visited Aug. 21, 2017).

pain.  (R. at 387).  Dr. Fruchter found that her abdomen was tender from her right side down to her groin, but the rest of the physical examination was unremarkable.  (R. at 380).  Dr. Fruchter also ordered a sonogram of Ms. Eli's kidneys, which revealed  three nonobstructive calcifications, but was "otherwise unremarkable." (R. at 387).

On January 29, 2013, Ms. Eli went to the Vassar Brothers Medical Center emergency department complaining of chest pain.  (R. at 389).  She was given aspirin, morphine, nitroglycerin, and Percocet, and told to follow up with Dr. Fruchter.  (R. at 390, 393).  Ms. Eli did so on February 6, 2013.  (R. at 377).   The doctors also ordered a "stress test" to try to determine the source of her pain.  (R. at 377).  The test was aborted before it was fully completed as Ms. Eli complained of increasing chest tightness and pain, radiating to the left side of her neck, as the exercise intensified.  (R. at 436).  The physician administering this test, Dr. Ronald Wallach, believed that these symptoms were "consistent with angina."[6]  (R. at 437).

Ms. Eli then saw Dr. Warren Bromberg on February 18, 2013, for

_____

[6]    Angina is "a severe, often constricting pain, usually referring to a. pectoris."  <u>Stedman's</u>  80.  A. pectoris is a "severe constricting pain in the chest, often radiating from the predcordium to a shoulder (usually left) and down the arm, due to ischemia of the heart muscle usually caused by coronary disease." <u>Id.</u>

her right flank pain. (R. at 438). Dr. Bromberg noted that she was visibly uncomfortable, and prescribed Percocet and suggested a renal scan in order to help diagnose Ms. Eli's ailment. (R. at 438). On February 27, 2013, Dr. Bromberg performed a scan which found no evidence of ureteral obstruction. (R. at 442-43).

Meanwhile, on February 22, 2013, Dr. Surinder Jindal ordered an x-ray on Mrs. Eli's hand, which was unremarkable. (R. at 590). On March 1, 2013, Dr. Jindal performed an upper extremity NCV-EMG, which revealed several deficiencies in Ms. Eli's nerve responses in her wrists. (R. at 476). Dr. Jindal opined that these findings evidenced "1) [r]ight C6-C7 radiculopathy,[7] 2) [b]ilateral median nerve entrapment at wrist, 3) [m]ild left radial sensory neuropathy,[8] 4) [and that] [d]istal latency conduction velocity is normal." (R. at 476). In light of these findings Dr. Jindal prescribed Norco for pain, a wrist brace, and an evaluation by a hand surgeon. (R. at 591). During this examination, Dr. Jindal noted that Ms. Eli was unable sit or stand for long periods of time, sleep through the night, and hold some objects due to the pain. (R. at 591). On March 16, 2013, Ms. Eli saw Dr. Swaminathan

---

[7] Radiculopathy is a "[d]isorder of the spinal nerve roots." Stedman's 1503.

[8] Neuropathy is "[i]n contemporary usage, a disease involving the cranial nerves or the peripheral or autonomic nervous system." Stedman's 1211.

Rajan, a hand surgeon.  (R. at 470).  Dr. Rajan examined Ms. Eli several times over the next month and found that she had carpal tunnel syndrome.  (R. at 470-73).

2.    Medical History Subsequent to Application for Benefits

Ms. Eli continued to receive treatment for her various illnesses following her application for SSI on March 23, 2013.  She was treated by Dr. Jindal on March 29, 2013.  (R. at 460).  Dr. Jindal again noted "tenderness and spasm in paraspinal L4, L5, and S1 region" and concurred with the diagnosis of carpal tunnel syndrome.  (R. at 460).  He again noted that "[p]rolonged sitting and standing aggravates the symptoms."  (R. at 460).  On April 4, 2013, Dr. Swaminathau Rajan performed surgery to attempt to relieve Ms. Eli's carpal tunnel syndrome.  (R. at 474-75).  After this surgery, she continued her treatment regimen with Dr. Jindal.  On April 26, 2013, Dr. Jindal noted tenderness and spasm in muscles in the plaintiff's lower back and "[d]ecreased sensation in the L5-S1 distribution." (R. at 585).  Ms. Eli returned to Dr. Jindal on May 20, 2013, again with back pain radiating down her thigh and leg. (R. at 583).  Dr. Jindal noted symptoms similar to those observed at the prior examination.  (R. at 583).  However, the pain management protocol did appear to provide some relief.  (R. at 583).

Ms. Eli also saw Dr. Fruchter for her continued right flank pain. (R. at 375-76). She returned to Dr. Riechers' office, receiving another gel injection to her right ureter on June 6, 2013. (R. at 468). Despite this injection, she was hospitalized on June 18, 2013, for a "massive obstruction" in her ureter. (R. at 465). She received a nephrostomy,[9] which relieved her pain, and was discharged the next day. (R. at 465-66). She had a follow-up appointment on June 21, 2013, as she was continuing to have tenderness on her right side. (R. at 547). Ms. Eli was treated with Vitamin D and oxycodone. (R. at 550). Dr. Riechers examined the plaintiff on July 1, 2013, reporting that she was still in pain. (R. at 463).

On July 18, 2013, Ms. Eli again saw Dr. Jindal. (R. at 581). He reported that the plaintiff suffered muscle spasms in the lumbosacral region. (R. at 581). She was able to perform a right straight leg raise to 40 degrees, and a left straight leg raise to 70 degrees. (R. at 581). Dr. Jindal noted that she had been prescribed pain medication by a different doctor and told her to follow up with a nephrologist for her abdominal issues. (R. at 581-82). She saw another doctor for her flank pain on July 23, 2013, and received antibiotics and oxycodone. (R. at 543-46). She was

---

[9] A nephrostomy is "[e]stablishment of an opening between the collecting systems of the kidney through its parenchyma to the exterior of the body." Stedman's 1192.

treated again for her flank pain on July 25, 2013. (R. at 575).

On August 6, 2013, Ms. Eli was referred to Dr. Bella Malits for pain management. Dr. Malits noted that she was suffering from abdominal and lower back pain, rating it "8 to 9/10 throughout the course of the day." (R. at 486-88). Dr. Malits prescribed oxycodone, though she cautioned Ms. Eli on the long term negative impacts of opiate usage. (R. at 487-88). Dr. Malits referred Ms. Eli to Nurse Practitioner Patricia Morelli-Sager for continued treatment. (R. at 488).

On August 9, 2013, Ms. Eli saw another nurse practioner, Patricia Rudy, for vaginal pain and tenderness. (R. at 537). Ms. Rudy performed a pap smear, which was negative for any lesion or malignancy. (R. at 555). Ms. Eli returned on August 20, 2013, with continued vaginal pain and tenderness. (R. at 535). Ms. Rudy prescribed acyclovir. (R. at 536).

Ms. Eli saw Ms. Morelli-Sager for the first time on September 9, 2013. (R. at 482). Ms. Morelli-Sager indicated that nerve blocks and oxycodone had not seemed to help the plaintiff, and she was currently experiencing pain at a 10/10 level on a daily basis. (R. at 482). Ms. Morelli-Sager noted that Ms. Eli had stooped posture and an antalgic gait, though she did not require a cane or walker. (R. at 482). The plaintiff was able to perform her activities of daily living, though Ms. Morelli-Sager noted that

these activities were growing increasingly difficult due to the pain. (R. at 482).

Meanwhile, Ms. Eli saw Dr. Riechers and discussed treatment options for her continued pain. (R. at 498). Given the lack of progress and her ongoing pain, she elected to have surgery to remove her problematic right kidney. (R. at 498). The plaintiff received a preoperative evaluation on September 10, 2013. (R. at 530). The evaluation revealed nothing out of the ordinary; Ms. Eli did not have any muscle atrophy, weakness, or joint injury. (R. at 530-33). An echocardiogram was performed, and found mild mitral and tricuspid regurgitation. (R. at 572). The kidney removal itself was performed by Dr. Riechers on September 17, 2013. (R. at 694). He noted that the surgery was on a "semi-urgent" basis due to the plaintiff's ongoing pain. (R. at 694). The surgery went as planned, and the right kidney was entirely removed. (R. at 694-95). Ms. Eli was still in pain from the procedure the next day, but there did not appear to be any more serious side effects. (R. at 507).

Ms. Eli saw Ms. Morelli-Sager again on October 1, 2013. (R. at 625). Ms. Morelli-Sager observed that the plaintiff walked in a hunched position with stooped posture, and a slightly antalgic gait, and generally appeared to be in some distress. (R. at 625). As was the case in the prior examination, Ms. Morelli-Sager noted

that Ms. Eli was having increased difficulty performing her daily activities due to chronic pain. (R. at 625). Dr. Riechers saw the plaintiff for a follow-up appointment on October 10, 2013, noting that she was still in pain. (R. at 580). He also performed an ultrasound, which confirmed that there were no issues with the left kidney, but that she was not properly emptying her bladder. (R. at 580).

Ms. Eli saw Ms. Morelli-Sager again on October 15, 2013. (R. at 626). The plaintiff still had pain if she had to hold her urine, but her doctors believed that this was relatively normal. (R. at 626). And while Ms. Morelli-Sager again noted Ms. Eli's stooped posture and antalgic gait, she also observed that the plaintiff was "able to get through her [activities of daily living] without too much difficulty." (R. at 626). A week later, on October 22, 2013, Ms. Eli went to emergency room with worsening right flank pain. (R. at 510-12). The doctors ran several tests to determine the source of the pain, with no success. (R. at 511). Ms. Eli was discharged the next morning as her acute pain wore off. (R. at 511-12). On November 1, 2013, Ms. Eli sprained her ankle and went to Ms. Rudy for treatment. (R. at 521). An x-ray revealed no signs of significant injury or joint abnormality. (R. at 565). By the time of her follow-up appointment on November 8, 2013, the plaintiff was in significantly less pain. (R. at 516).

On the same day she met with Dr. Riechers for continued right flank pain. (R. at 578). Dr. Riechers performed a cystoscopy which found nothing of note. (R. at 578).

Ms. Eli returned to her doctors for treatment of a urinary tract infection on December 10, 2013. (R. at 662). A preliminary test was negative, but Ms. Eli was treated with oxycodone, omeprazole, and Ciprofloxacin. (R. at 662, 666). Dr. Riechers performed an ultrasound of her kidneys three days later, which was unremarkable. (R. at 641). However, the plaintiff continued to be in great pain, and saw Ms. Morelli-Sager on December 16, 2013. (R. at 699). Ms. Morelli-Sager again noted that Ms. Eli could complete her activities of daily living "without too much difficulty." (R. at 699).

Ms. Rudy treated Ms. Eli on January 10, 2014, for chest pain radiating through the left side of her neck and left arm. (R. at 658). The plaintiff returned on January 13, 2014, at which time Ms. Rudy noted that the plaintiff could perform her activities of daily living "without too much difficulty." (R. at 628). Ms. Eli saw Dr. Samin Sharma for her chest pain on January 15, 2014. (R. at 611). Dr. Sharma believed that this pain was "likely psychosomatic in nature," and suggested that Ms. Eli continue with her medications, exercise, and eat a healthy diet. (R. at 613).

Ms. Eli was treated by Dr. Verhoest on January 21, 2014, for

continued chronic right flank and pelvic pain. (R. at 701). Dr. Verhoest performed a bladder instillation,[10] which lead to significant improvement in Ms. Eli's pelvic pain. (R. at 701). The success of the treatment lead Dr. Verhoest to believe that the plaintiff was suffering from painful bladder syndrome.[11] (R. at 701). Dr. Verhoest examined Ms. Eli again on February 25, 2014. (R. at 705). Dr. Verhoest ran more tests and concluded that there had not been a significant reduction in pain due to the bladder instillation, and therefore the problem was likely not originating in the bladder. (R. at 705). Dr. Verhoest suggested Ms. Eli seek out a gastroenterologist (R. at 705), and she saw Dr. Roxan Saidi on March 12, 2014. (R. at 688-89). Dr. Saidi concluded that Ms. Eli's pain was due to a combination of factors including "endometriosis, chronic narcotic use, adhesions from a pelvic surgery and bowel surgery, and recurrent ureteral disease." (R. at 689). Dr. Saidi recommended further tests in order to determine

---

[10]   A bladder instillation is a treatment for interstitial cystitis in which the doctor uses a catheter to insert medication directly into the bladder, where it remains for about fifteen minutes before being expelled via urination. Interstitial Cystitis -- Diagnosis & Treatment, available at http://www.mayoclinic.org/ diseases-conditions/interstitial-cystitis/diagnosis-treatment/tre atment/txc-20251968 (last visited Aug. 21, 2017).

[11]   Painful bladder syndrome is another name for interstitial cystitis.   Interstitial   Cystitis,   available   at http://www.mayoclinic.org/diseases-conditions/interstitial-cystit is/home/ovc-20251830 (Last visited Aug. 21, 2017).

more accurately the cause of Ms. Eli's pain. (R. at 689). To that end, Dr. Saidi performed an endoscopy and a colonoscopy on March 19, 2014. (R. at 690). Other than a minor hernia, these tests revealed nothing of note. (R. at 690-91). Dr. Saidi concluded that the chronic pain was likely due to irritable bowel syndrome and narcotic gut. (R. at 691).

Ms. Eli saw Ms. Morelli-Sager during this time period as well. On February 10, 2014, Ms. Morelli-Sager noted that Ms. Eli's chronic pain was making it increasingly difficult for her to get through her daily activities. (R. at 629). Ms. Morelli-Sager examined Ms. Eli again on March 4, 2014, and made the same findings. (R. at 631). Given the potential side effects of long term oxycodone usage, Ms. Morelli-Sager prescribed methadone as a long term pain control medication. (R. at 631-32). However, the plaintiff took a methadone tablet the same day and had a negative reaction, experiencing tightness in the chest and nausea. (R. at 633). On March 11, 2014, Ms. Eli saw Ms. Morelli-Sager again, still experiencing a great deal of pain in her pelvis, flank, and leg. (R. at 634). Ms. Morelli-Sager again noted that Ms. Eli was having increased difficulty completing her activities of daily life. (R. at 634).

Meanwhile, Dr. Riechers was attempting to determine the cause of Ms. Eli's continued pain. On March 12, 2014, Dr. Riechers

performed a cytoscopy and urethral dilation and observed symptoms consistent with interstitial cystitis. (R. at 640). Ms. Eli also had a CT scan of her abdomen and pelvis done on March 22, 2014. (R. at 680). While this scan showed no issues with her kidneys, it did show a high density in the gallbladder, indicative of gallstones or biliary sludge. (R. at 680). Later that day, Ms. Eli went to the emergency room, complaining of left-sided abdominal pain. (R. at 683). She was discharged home a few hours later after receiving pain medication. (R. at 685-86). An x-ray was performed that showed she had abnormal curvature in her spine, but no acute issues. (R. at 682).

Ms. Eli followed up with Ms. Morelli-Sager on March 26, and told her of the interstitial cystitis diagnosis. (R. at 636). The plaintiff also told Ms. Morelli-Sager that she was having chronic back pain. (R. at 636). Ms. Morelli-Sager again noted that Ms. Eli's pain was making it increasingly difficult to live her daily life. (R. at 636). The plaintiff returned to one of her doctors, Dr. Loretta Obi, two days later, March 28, 2014, complaining of lower abdominal pain. (R. at 648). Dr. Obi noted that Ms. Eli was not suffering from any muscle atrophy or weakness, and that she had intact joints and a normal gait. (R. at 651). Dr. Obi gave the plaintiff more oxycodone for her pain. (R. at 652).

Ms. Eli then injured her back while fishing, and was treated

by Dr. Sumita Mazumdar on April 17, 2014. (R. at 645-47). A physical examination confirmed muscle cramps and spasms in the lower back, and Dr. Mazumdar prescribed Tylenol with codeine for the pain. (R. at 645-46). The plaintiff went to the emergency room on April 26, 2014, with continuing abdominal pain. (R. at 678). She was given Percocet and discharged. (R. at 679).

Two months later, Ms. Eli was in a car accident and broke her hand. (R. at 729-31). The doctors who treated her noted that her motor movements were weakened, and there was swelling, but no scissoring, crossover, or indications of a more severe break. (R. at 729-31). She followed up a month later, on July 16, 2013, complaining that she still was feeling a persistent ache from the injury. (R. at 726-28). The doctor recommended weaning the plaintiff off the pain medication and the brace she was wearing, and encouraging her to perform hand strengthening exercises. (R. at 728).

B. <u>Procedural History</u>

The Commissioner initially denied the plaintiff's claim for SSI benefits. (R. at 66-75, 78-89). Ms. Eli requested a hearing before an administrative law judge ("ALJ") to review this decision (R. at 90-92), and the hearing was held on July 18, 2014, before ALJ Robert Gonzalez (R. at 39-65).

At the hearing both the plaintiff and a vocational expert,

Sugi Pomerov, testified.  (R. at 41-65).  Ms. Eli testified that she had completed ninth grade, and never received a high school diploma or undertaken any other further education.  (R. at 42-43). She had not worked for the prior fifteen years, and was being supported by her family.  (R. at 43).  She lived with her boyfriend and four children.  (R. at 43).

The plaintiff testified that she suffered from kidney issues, Crohn's disease, interstitial cystitis, endometriosis, scoliosis, and osteoporosis.  (R. at 44).  She discussed how her various illnesses made daily activities like standing, sitting, or walking more difficult.  (R. at 46-47).  Due to her urinary issues, she needed to use the restroom every fifteen minutes.  (R. at 45).  Ms. Eli was unable to walk for more than five or ten minutes, stand in place for more than five to seven minutes, or sit for more than ten minutes.  (R. at 47-48).  Due to the pain, the plaintiff struggled to take care of her children and required their help for household tasks like laundry, cleaning, and cooking.  (R. at 50). Her medical conditions prevented her from engaging in other basic activities like tying her shoes, driving a car, or sitting through a movie. (R. at 52-53).  She was also forced to homeschool her children because they were missing too many days of school to care for her. (R. at 50-51).  Unfortunately, her pain medication was not providing adequate relief for these problems.  (R. at 48).  Ms. Eli

also claimed that she was having difficulties with short term memory. (R. at 49).

Since the plaintiff had no prior work history, the ALJ provided the vocational expert, Ms. Pomerov, with two hypothetical scenarios. (R. at 60-61). Ms. Pomerov found that if Ms. Eli had the general residual functional capacity for sedentary work and was able to handle objects with her right arm, stoop, crouch, kneel, and remember, understand and carry out simple work, she would be able to work in positions such as surveillance system monitor, telephone quotation clerk, food and beverage order clerk, or call out operator. (R. at 60-61). If Ms. Eli had these abilities, but would be off-task twenty percent of a normal work day beyond standard breaks, Ms. Pomerov believed that there would be no job for which Ms. Eli would qualify. (R. at 61).

On January 8, 2015, the ALJ found that Ms. Eli was not disabled. (R. at 18-32). The Appeals Council denied the plaintiff's request for review on June 22, 2016. (R. at 1-3).

Discussion

A. Standard of Review

A claimant is disabled under the Social Security Act and therefore entitled to disability benefits if she can demonstrate, through medical evidence, that she is unable to "engage in any substantial gainful activity by reason of any medically

20

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Arzu v. Colvin, No. 14 Civ. 2260, 2015 WL 1475136, at *7 (S.D.N.Y. April 1, 2015). The disability must be of "such severity that [the plaintiff] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is entitled to disability benefits, the ALJ must employ a five-step sequential analysis. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the claimant must demonstrate that she is not currently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), (b), 416.920(a)(4)(i), (b). Second, the claimant must prove that she has a severe impairment that significantly limits her physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). Third, if the impairment is listed in what are known as "the Listings," see 20 C.F.R. Part 404, Subpt. P, App. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d),

416.920(a)(4)(iii), (d).  Fourth, if the claimant is unable to make
the requisite showing at step three, she must prove that she does
not have the residual functional capacity to perform her past work.
20 C.F.R. §§ 404.1520(a)(4)(iv), (e), 416.920(a)(4)(iv), (e).
Fifth, if the claimant satisfies her burden of proof on the first
four steps, the burden shifts to the AlJ to demonstrate that there
is alternative substantial gainful employment in the national
economy that the claimant can perform.  20 C.F.R. §§
404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g), 416.960(c);
Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23
(S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77
(2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir.
1986)).  In order to determine whether the claimant can perform
other substantial gainful employment, the ALJ must consider
objective medical facts, diagnoses or medical opinions based on
these facts, subjective evidence of pain or disability, and the
claimant's educational background, age, and work experience.  Brown
v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

Under Rule 12(c) of the Federal Rules of Civil Procedure, a
party is entitled to judgment on the pleadings if she establishes
that no material facts are in dispute and that she is entitled to
judgment as a matter of law.  See Sellers v. M.C. Floor Crafters,

Inc., 842 F.2d 639, 642 (2d Cir. 1988); Morcelo v. Barnhart, No. 01 Civ. 743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Social Security Act provides that the Acting Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A court reviewing the Acting Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." Geertgens v. Colvin, No. 13 Civ. 5133, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); accord Longbardi, 2009 WL 50140, at *21.

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Acting Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. Tejada, 167 F.3d at 773; Calvello, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21 (citing Brown, 174 F.3d

23

at 62, and <u>Williams v. Bowen</u>, 859 F.2d 255, 258 (2d Cir. 1988)).

Substantial evidence in this context is "more than a mere

scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." <u>Hahn</u>, 2009 WL

1490775, at *6 (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401

(1971)).

B.    <u>The ALJ's Decision</u>

ALJ Gonzalez evaluated Ms. Eli's claim pursuant to the five

step sequential evaluation process and concluded that Ms. Eli was

not disabled at any time since the alleged onset date. (R. at 21-

32).

At step one, the ALJ found that Ms. Eli had not engaged in

substantial gainful activity in the relevant time period. (R. at

23). At step two, he determined that Ms. Eli had the following

severe impairments: irritable bowel syndrome, status post right

nephrectomy, right hydronephrosis, lumbar spine radiculopathy,

cervical spine degenerative disc disease, status post carpel tunnel

syndrome, fibromyalgia, rheumatoid arthritis, and a closed non-

displaced fracture of the fifth metacarpal bone in the right hand.

(R. at 23). At step three, however, the ALJ determined that none

of these impairments was of a severity to meet or medically equal

one of the "listed impairments" in Appendix 1 of the regulations.

(R. at  25-26).

At step four, the ALJ determined that the plaintiff had the residual functional capacity to "perform sedentary work as defined in 20 CFR 416.967(a) except [she] can frequently handle and finger with the right upper extremity; can occasionally stoop, crouch and kneel; and can understand, remember and carry out simple routine work." (R. at 26). In reaching this conclusion, the ALJ considered the plaintiff's reported symptoms and found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for several reasons." (R. at 27). In particular, the ALJ found that the medical records did not support the plaintiff's testimony regarding her disability and contradicted the medical source statements of Drs. Fruchter, Jindal, and Bromberg. (R. at 27-31). The ALJ considered the opinions of these doctors, but gave them less than controlling weight. (R. at 30).

At step five, the ALJ determined that given her residual functional capacity, Ms. Eli could work as a sedentary, unskilled worker in a position such as a surveillance system monitor, call out operator, telephone quotation clerk or food/beverage order clerk. (R. at 32). Therefore, a finding of "not disabled" was appropriate.

The plaintiff challenges the ALJ's decision on the grounds that the ALJ (1) failed to given controlling weight to the treating

physicians in assessing his residual functional capacity; and (2) improperly rejected the plaintiff's testimony about her functioning and symptomology. (Plaintiff's Brief in Support of a Motion for Judgment on the Pleadings (Social Security) at 11-18).

   C.   Treating Physician Rule

   The plaintiff claims that the ALJ erroneously evaluated the medical evidence by improperly assigning limited weight to the findings of Drs. Jindal, Fruchter, and Bromberg.  The SSA regulations establish that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)); Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010).  "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate."  Correale-Englehart, 687 F. Supp. 2d at 426 (quoting 20 C.F.R. § 416.927(d)(2)).

In considering a treating source's opinion, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." Rosa, 168 F.3d at 79 (quoting McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2d Cir. 1983)); see also Wagner v. Secretary of Health and Human Services, 906 F.2d 856, 862 (2d Cir. 1990) (noting that an ALJ's critique "must be overwhelmingly compelling in order to overcome a medical opinion"). However, determination of "dispositive" issues, such as whether the plaintiff "meet[s] the statutory definition of disability" and cannot work, are reserved for the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

The ALJ is not required to give the treating physician controlling weight, but he is required to give "good reasons" for the assignment of weight that he chooses.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  "Reserving the ultimate issue of disability to the Commissioner relieves the [SSA] of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited." Snell, 177 F.3d at 134.

If the ALJ determines that a treating physician's opinion is not controlling, he must consider the following factors in

determining the weight to be given to that opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the relationship; (3) the evidence provided to support the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c); see Halloran, 362 F.3d at 32. "The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken." Fontanarosa v. Colvin, No. 13 CV 3285, 2014 WL 4273321, at *9 (E.D.N.Y. Aug. 28, 2014).

### 1. Findings of the Treating Physicians

In February 2013, Dr. Bromberg, Dr. Fruchter, and Dr. Jindal each independently filled out medical source documents addressing Ms. Eli's physical capacity to work.

Dr. Fruchter, the plaintiff's primary care physician, diagnosed her with chest pain, right flank pain, and hydronephronesis. (R. at 457). He opined that while Ms. Eli's prognosis in terms of ability Ms. to work was "fair," her impairments were expected to last at least another year. (R. at 457). Dr. Fruchter believed that given her state, Ms. Eli would not be able to work, and she would be absent more than three times

a month if she did have a job. (R. at 457). He noted that Ms. Eli's pain frequently interfered with her concentration, and she had a marked limitation in ability to deal with work stress. (R. at 457). Dr. Fruchter found that the plaintiff could only sit, stand, or walk for under two hours, and could only walk a single block without rest or severe pain. (R. at 457). He noted that Ms. Eli could not carry heavy loads, though she could occasionally carry ten pounds and frequently carry less than five pounds. (R. at 457).

Dr. Bromberg's medical source document largely mirrors that of Dr. Fruchter. The primary difference is that Dr. Bromberg believed that Ms. Eli could only walk half of a city block without severe pain or rest, and could only occasionally carry less than five pounds, and never carry more than ten. (R. at 458). Dr. Jindal reached much the same conclusions. Dr. Jindal believed that the plaintiff's prognosis was guarded. (R. at 459). He opined that she could sit, stand, or walk for about two hours without rest, and walk between one-half and a whole city block. (R. at 459). But he agreed with Drs. Bromberg and Fruchter that she could not work, and that she would be absent more than three times each month. (R. at 459).

2.  <u>Analysis</u>

The ALJ assigned "little weight" to the opinions of Drs. Fruchter, Bromberg, and Jindal because, according to the ALJ, their opinions did not comport with the medical records. (R. at 30). Additionally, the ALJ noted that these opinions were proffered prior to Ms. Eli's carpal tunnel and kidney removal surgeries which improved her condition.

First, for all three of these opinions, the ALJ failed to consider all the factors relevant to determine how much weight to assign each opinion. The ALJ appears to have considered only two of the six required factors -- the evidence provided to support the medical source statement and the consistency of the opinion with the whole record. While the ALJ is not required to make a rote recitation of each prong, there was no discussion of potentially influential factors like the length and frequency of treatment, and the doctors' respective specialties. Dr. Bromberg appears to be a urologist or renologist. (R. at 402). Dr. Jindal is a neurologist and pain management specialist. (R. at 460). While there are only records from a single meeting with Dr. Bromberg (R. at 438), it appears that Dr. Bromberg works in the same office as Dr. Riechers, who treated the plaintiff many times (R. at 164). Dr. Fruchter, as Ms. Eli's primary physician, treated her starting in August 2012, and throughout the relevant time period. (R. at 166). The

plaintiff also saw Dr. Jindal many times in 2013 for her pain management. (R. at 460, 476, 581-583, 585-86, 590). The ALJ appears to have paid no regard to these factors which potentially weigh in favor of deference. This alone is grounds for remand. See, e.g., Ramos v. Commissioner of Social Security, No. 13 CV 3421, 2015 WL 7288658, at *7 (S.D.N.Y. Nov. 16, 2015); Clark v. Astrue, No. 08 CV 10389, 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010).

But beyond the failure to evaluate the proper factors, the reasoning that the ALJ does provide for his decision is inadequate. He notes that much of the medical record indicates that Ms. Eli was "neurologically intact with no issues with strength sensation or reflex," and argues that this contradicts the three treating physicians' findings. (R. at 30). However, the lack of these symptoms in no way precludes the treating physicians' reports on her capacity to work. Rosa, 168 F.3d at 79 ("[T]he ALJ simply was not in a position to know whether the absence of [certain symptoms] would in fact preclude the disabling loss of motion described by [treating physician] in his assessment."). By the very nature of Ms. Eli's ailments, this sort of physical evidence would not have been present. Ms. Eli's primary complaints did not relate to strength, reflex, or limitations of movement, but rather to extreme chronic pain, particularly in her abdomen. This pain was well

documented by multiple doctors over the course of many years, none of whom expressed any doubts about Ms. Eli's credibility in reporting her pain. And her various treating physicians note the severity of these symptoms repeatedly. (R. at 482, 409, 699, 634).

The ALJ also failed to cite any medical opinion to dispute the treating physicians' conclusions. "In the absence of supporting medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings." Filocomo v. Chater, 944 F. Supp. 165, 170 (E.D.N.Y. 1996). Yet that is exactly what ALJ Gonzalez did. No consulting physician examined Ms. Eli or reviewed her medical history. And while some of her other doctors provided slightly different evaluations at different points in their treatment as Ms. Eli's symptoms waxed and waned, none of them opined on Ms. Eli's ability to work, or provided evidence to contradict the three treating physicians' reports. The ALJ maintained that Ms. Morelli-Sager noted at several points that Ms. Eli could perform her activities of daily living. (R. at 30). But Ms. Morelli-Sager also repeatedly noted that these activities were growing more and more difficult for the plaintiff due to her pain. (R. at 629, 631, 634, 636). Furthermore, it is unclear what these activities entailed, and how they might translate to being able to work at a sedentary job. Cf. Browne v. Commissioner of Social Security, 131 F. Supp. 3d 89, 99-100 (S.D.N.Y. 2015) (explicit

listing of activities of daily living claimant meant treating physician's "opinion was inconsistent with other substantial medical evidence in the record"). The claimant's "ability to perform some daily activities does not necessarily conflict with [the treating physicians'] opinions regarding [the claimant's] functional limitations in an eight-hour competitive work environment. Cabrera v. Berryhill, No. 16 CV 4311, 2017 WL 3172964, at *12 (S.D.N.Y. July 25, 2017). While the ALJ can and should consider the claimant's everyday activities in making his determination, it is legal error to presume, without further development, that such activities demonstrate a lack of disability. Archambault v. Astrue, No. 09 Civ. 6363, 2010 WL 5829378, at *30 (S.D.N.Y. Dec. 13, 2010), report and recommendation adopted, 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011).

The ALJ also found that the conservative treatment recommended by Ms. Eli's doctors is evidence of a lack of disability. (R. at 30). First, I do not agree that a nearly decade-long treatment program, often involving multiple examinations by different specialists each month, continued prescriptions of powerful painkillers like oxycodone, repeated in-patient hospitalizations, and a number of surgeries requiring general anaesthesia including the removal of Ms. Eli's entire right kidney, constituted a "routine" or "conservative" treatment plan. There may have been

individual meetings where one of Ms. Eli's doctors suggested a more conservative course of action, but the ALJ has zeroed in on these relatively few suggestions without regard for the vast majority of the record. And even if the ALJ's analysis were correct, the Second Circuit has stated that the treating physician's opinion should not "be discounted merely because he has recommended a conservative treatment regimen." Burgess, 537 F.3d at 129; Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); see also Holman v. Colvin, No. 12 Civ. 5817, 2014 WL 941823, at *6 n.2 (S.D.N.Y. March 11, 2014). To do so improperly substituted the ALJ's understanding of the severity of the illness and proper medical treatment for that of the physician. Mercado v. Colvin, No. 15 Civ. 2283, 2016 WL 3866587, at *17 (S.D.N.Y. July 13, 2016).

The ALJ also discredited the treating physicians' reports because they predated Ms. Eli's carpal tunnel and kidney removal surgeries. (R. at 30). He found that these operations "showed improvement to the claimant's condition." (R. at 30). However, the record does not support this conclusion, particularly with regard to the kidney removal. While Dr. Riechers expected the kidney removal to eliminate Ms. Eli's symptoms, this was unfortunately not the result. (R. at 579). Ms. Morelli-Sager, Dr. Saidi, and Dr. Riechers himself all noted continued and even worsening pain after this operation, leading to further treatment,

surgery, and medication. (R. at 628-31, 634, 636, 640, 651, 688-89, 699). While an ALJ need not "mention[] every item of testimony presented," <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1040 (2d Cir. 1983), he may not ignore or mischaracterize evidence, <u>see</u> <u>Erickson v. Commissioner of Social Security</u>, 557 F.3d 79, 82-84 (2d Cir. 2009); <u>Kohler v. Astrue</u>, 546 F.3d 260, 269 (2d Cir. 2008).

Given that the ALJ has not offered adequate reasons to discount the opinions of Dr. Fruchter, Dr. Bromberg, and Dr. Jindal, remand is appropriate. <u>See, e.g.</u> <u>Augustine v. Astrue</u>, No. 11 Civ. 3886, 2012 WL 2700507, at *9-10 (E.D.N.Y. July 6, 2012).

### D. <u>Credibility</u>

The plaintiff also alleges that the ALJ improperly rejected her own testimony regarding her symptoms. The ALJ's credibility findings are entitled to deference as long as they are sufficiently specific and supported by substantial evidence. <u>Tricarico v. Colvin</u>, 681 F. App'x 98, 100 (2d Cir. 2017); <u>Simmons v. Commissioner of Social Security</u>, 103 F. Supp. 3d 547, 569 (S.D.N.Y. 2015). The ALJ's task is to determine the extent to which the claimant's self reported symptoms could "'reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (quoting 20 CFR § 404.1529(a)). In assessing the plaintiff's assertions of pain and limitations, the ALJ must follow

a two step process. First, the ALJ must determine whether the claimant has a "medically determinable impairment that could reasonably be expected to produce" the alleged symptoms. 20 C.F.R. § 416.929(b). Second, the ALJ must evaluate "the intensity and persistence of [the claimant's] symptoms" and determine how much they impair the claimant's ability to work. 20 C.F.R. § 416.929(c).

Here, the ALJ only discussed the second half of the inquiry, finding that Ms. Eli's description of the effect of her symptoms on her daily living was not credible because it was contradicted by the medical records. (R. at 30). In particular, the ALJ noted that aside from Ms. Eli's "own testimony, there is little other evidence in the record to support her preclusion from her essential activities of daily living," again citing Ms. Morelli-Sager's notes that the plaintiff was able to complete some activities of daily living. (R. at 30). But, as discussed above, the ALJ's analysis of Ms. Morelli-Sager's notes focused solely on the reports that fit his evaluation, while ignoring her other reports that these activities were growing more difficult. Moreover, the ALJ provides no reason for crediting some of these reports over the others. This is not a case where the plaintiff's claims are flatly refuted by or find no support in the medical record. Cf. Besser v.

<u>Berryhill</u>, No. 16 CV 850, 2017 WL 2869931, at *5 (N.D.N.Y. July 5, 2017).

The ALJ reasoned that Ms. Eli's attempt to go fishing showed that her claims of disability were not credible (R. at 30), an argument adopted by the Commissioner. (Memorandum of Law in Support of the Defendant's Cross Motion for Judgment on the Pleadings and in Opposition to the Plaintiff's Motion for Judgment on the Pleadings at 24). But, "a claimant need not be an invalid to be found disabled." <u>Balsamo v. Chater</u>, 142 F.3d 75, 81 (2d Cir. 1998) (quoting <u>Williams</u>, 859 F.2d at 260). A claimant's activities do not rebut her claim of disability "unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job." <u>Polidoro v. Apfel</u>, No. 98 Civ. 2071, 1999 WL 203350, at *8 (S.D.N.Y. April 12, 1999). The fact that Ms. Eli was injured while briefly performing a low impact, sedentary activity like fishing does not undermine her claim of disability. "When a disabled person gamely chooses to endure pain in order to pursue important goals," such as basic daily activities, "it would be a shame to hold this endurance against [her] in determining benefits unless [her] conduct truly showed that [she] is capable of working." <u>Nelson v. Bowen</u>, 882 F.2d 45, 49 (2d Cir. 1989). Therefore, on remand, the ALJ must reevaluate the plaintiff's credibility in

light of these legal principles as well as his further consideration of the opinions of the treating physicians.

<u>Conclusion</u>

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings (Docket No. 20) is denied, the plaintiff's motion (Docket No. 16) is granted, and this case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The Clerk of the Court is respectfully directed to enter judgment accordingly and close this case.

SO ORDERED.

*James C. Francis IV*

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
      August 21, 2017

Copies transmitted this date to:

Howard D. Olinsky, Esq.
Olinsky Law Group
300 S. State St., Suite 420
Syracuse, NY 13202

Robert R. Schriver, Esq.
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Rm. 3904
New York, NY 10278-0004